Good morning, and may it please the court. My name is Michael Gottfried. I'm an assistant attorney general for the state of Arizona and represent the defendants here in their official capacities. That is the state of Arizona and its prison system. Arizona regulates an inmate's access to sexually explicit material, just like Oregon, just like Washington, just like a bunch of other states. Arizona's regulation is virtually identical and substantively indistinguishable from the regulation approved by the Supreme Court in Thornburg. Arizona's regulation is also not as broad, not as expansive as the regulation approved by this court in Boramaport. These identical regulations, the publication regulations for the Department of Corrections, were reviewed by three other Arizona district court judges and found to be facially constitutional. Yet this district court found these regulations to be unconstitutionally overbroad, ostensibly applying the Turner v. Safley framework. And what's remarkable about the district court's conclusion, and what really highlights how wrong it was, is that if the Arizona Department of Corrections was to copy the regulation in Thornburg verbatim, word for word, it still wouldn't comply with the injunction the court issued here concerning the regulations. Similarly, if the Department of Corrections copied the regulation approved by this court in Boramaport, word for word, verbatim, it wouldn't comply with the district court's injunction here. There's numerous reasons why the district court here was wrong in finding these regulations constitutionally overbroad. The first about one seems to me, at least, a significant difference between these regulations and the regulations in the cases you mentioned, is section 1.2.17, the may cause or encourage sexual excitement or arousal. I lied in some words. There's a bunch of verbs. May or is intended to, but may seems to be the broadest. Caused or encouraged sexual excitement or that provision to capture that is not captured by 1.2.1's nudity and 1.2.2's enumeration of sexual acts. And then second, how is, presumably it's something broader, and how is that tied to the interest that you claim supports this regulation? Yes, Your Honor. That specific question was not addressed in Thornburg and Morrow and Boramaport. But, and I can tell you from experience, though it's not part of the record, there are numerous services out there that supply photos to inmates. And these photos are of men and women in positions that you wouldn't see in a workplace. They're fully dressed, but they're skimpily dressed. And again, posing in positions that you would not see in your daily life and not see in a workplace. And I think it's meant to cover those kinds of situations. And this court, unpublished decision, but still this court, in a case called Roberts v. Apton, faced that very question. And there was a regulation, just like Arizona's, regulating suggestive poses. And that court said there's no substantive difference between suggestive poses, because they can cause all the problems sought to be corrected, set out by Morrow and set out by the Department of Corrections here. No distinction between that and the pictures allowably regulated in Morrow. That there's no distinction that can be corrected. And just to go a little further with that, if that was the court's, the district court's problem with this regulation, it could have easily just severed that part of it, or enjoined enforcement of that part. But the district court didn't do that. It enjoined enforcement of the whole regulation and then turned around and directed the Department of Corrections what must be in its new regulation, which was proper. I understand the district court went a lot broader than this, but just, if I could just ask you one more question about this part. I mean, I take your point about the sort of sexually suggestive images, but this, it seems like this is far broader than just that. I mean, the universe of material that may, in someone, cause sexual excitement, cause or encourage sexual excitement or arousal is extraordinarily broad. Wouldn't you agree? Yes, it is, Your Honor. And that's the problem with trying to regulate text. One person's plain vanilla picture is another person's most exciting picture in the world. One person's plain vanilla text is another person's most exciting text in the world. And the break on that is there has to be an additional finding under the Arizona Department of Correction rules, not anything required by any court, that it's also harmful or detrimental to the prison. So something that is just a person standing in a short-sleeved shirt and shorts would be hard to justify as being detrimental to the prison. Somebody bending over backwards on a chair in a skimpy outfit is a lot easier to bring into that area. And that's the breaking point. Doesn't that rather prove the overbreadth of that provision? No, Your Honor, because there's overbreadth under Turner is simply whether there's a rational relationship between what's sought to be regulated and legitimate penological goals. And this court in Morrow has already made that determination, that regulating sexually explicit material, and that's what the court said, not sexually explicit pictures, getting sexually explicit materials is rationally related to the exact same penological goals that the department set out here. So in the normal First Amendment context, sure, that may be overbroad. But Turner is a different kind of analysis. Turner's a deferential analysis. Not to be facetious, but the posters in Shawshank Redemption of Rita Hayworth and Raquel Welch, they'd be plainly out under this, right? It could be, Your Honor. But this court, look at Baramapur. All sexually explicit material could be regulated, and this court approved that regulation. In Morrow... Let me ask you, mechanically, sorry to interrupt, but I want to make sure we get all our topics discussed. Part of the problem here is, you mentioned sort of the eye of the beholder, but here there's not just one eye. Anyone in the mailroom can make that judgment, and they can make different judgments. So we're in a slightly different situation from these other cases, because I'm not sure I've seen an identical one to this, but maybe you can correct me. Well, Your Honor, that issue came up in Thornburgh. That issue came up in Thornburgh, where the court said that incoming mail requires there be discretion, that there's going to be different decisions made because of that discretion, and that's okay. And the uncontroverted evidence in this case is these officers are trained. This is all they do, is publication review. They're much like the warden making the decision in Thornburgh. You have one person, again, trained to do this, that's making the ultimate decisions on these, if everyone appeals. And the fact that, it's also uncontroverted, that there's thousands and thousands of publications reviewed weekly at the department, that one person couldn't be doing this. So the fact that there's multiple people doing it is justified, and the court in Thornburgh said that's perfectly okay. This issue also came up in Morrow, where the sentencing judge that you joined was talking about how these are low-level people making the decision, while in Thornburgh it was the warden, and the en banc court rejected that argument and accepted that these low-level people could be making those decisions. Given that this is a facial challenge, this is sort of following up on the chief judge's question about the way that people are making these decisions, we have in the record here a lot of examples of what I think we would all agree are some pretty innocuous pictures of fully clothed people just standing there that nonetheless were censored. So what is the relevance of that fact to the facial challenge analysis? Your Honor, I don't think there's any relevance at all to that fact. I mean, even outside of the prison context, this court in Pickup, the Supreme Court in Hoffman has made it clear that a facial analysis is a legal analysis. It's a question of law, of looking at the language of the statute, and outside information isn't relevant. But within the Turner framework, it's even less relevant. Turner's not looking to whether mistakes were made. Turner's not looking to whether it's 100% consistent or not. Turner's only looking, and the district court only looked at the first Turner prong. Turner's only looking in that first prong if there's a reasonable, rational relationship, a valid, rational relationship between the regulation and the prison's objectives. And this court answered that question in Morrow, and it shouldn't have gone further than that. That's the end of inquiry. And frankly, even if you were doing a traditional First Amendment analysis, Judge Wheeler, you mentioned that there were lots of mistaken or obnoxious decisions. I'm not so sure there were lots. I mean, I think at best, the district court pointed to four or five. PLN's attorneys pointed to a few more, maybe 10. But again, the uncontroverted evidence is a week, 10, 50, 100, 1,000 even, wrong decisions, if you want to even consider them wrong, don't rise to the level in a non-prison First Amendment analysis, where a substantial number of those publications have to be improper in order to look at something overbroad. But the Turner analysis, this court in Barrancourt made it clear. The inmate there complained and said, hey, you have to do a separate vagueness and overbreath analysis outside of Turner. And this court said no and went right to the Turner analysis. Overbreath, vagueness is all subsumed within Turner, not reliant on outside information. And all that's required, this court said, all that it has to be is the prison complex having a reasonable decision that it would go and make this regulation. And again, in moral, this court said it was reasonable. Just what I say. Would you like to reserve? Yes, I'd like to reserve the rest of my time. Thank you. You're muted. Thank you. Good morning, Your Honor. This is Lisa Ells. I represent Prison Legal News. The plaintiff in this matter and appellee. The Arizona Department of Corrections has asked this court to uphold a ban on speech so broad, so unprecedented, that it authorizes mailroom employees to censor the words of federal district courts, great works of literature, and reproductions of art hanging in the Vatican or painted on the Vatican ceiling as being sexually explicit. The policy at issue here is so extreme, it bears no resemblance to any regulation ever upheld by any court, even under the highly deferential Turner standard. The district court properly found that ADC's policy defining sexually explicit is so expansive, it covers literally any text or image depicting sex, regardless of whether it's graphic, regardless of whether it's salacious, regardless of whether the context is newsworthy. And it even allowed them to authorize the censorship of a single word rape in the middle of a news article by Prison Legal News. And indeed, as Judge Miller already pointed to, the policy covers material even beyond actual depictions of sex. And this is important. So Mr. Godfrey talked about the fact that he thinks that that provision of 1.2.17 is to prohibit sexually suggestive photos. First of all, this provision covers text as well as photos. Second of all, the language in this provision has an or. It's sexually suggestive or it may cause arousal or excitement and all of the other many, many things it could cause that are sexual related, hypothetically. The district court was correct to find that this policy bore no rational relationship to defendants asserted penological interest on Turner. It is an exaggerated response that can't withstand constitutional scrutiny. It does not pass the common sense test to think it poses a security concern to permit prisoners to read the words of the 10th Circuit's published opinions, reciting facts necessary to their legal conclusions, to read Mayo Clinic newsletters describing reproductive health issues, to read mainstream news coverage about ISIS abuses and the MeToo movement, or to look at pictures of Caravaggio paintings inside the Vatican magazine. But ADC banned all of these things. It's not an accident. They are covered by the literal scope of this policy. The district court was also correct to find that defendants articulated no good reason or any reason really to ban PLN's magazine. The language of PLN is news. They applied it to censor four different issues of PLN. PLN is not pornography. It is an award-winning legal publication that reports on by any of the 3,000 correctional facilities for being sexually explicit until ADC. Nonetheless, ADC censored PLN for being sexually explicit for utilizing the word rape a single time in one article with no additional context or sexual content, stating the factual basis for a criminal charge of sodomy of a minor in a non-graphic manner, and quoting from the 10th Circuit's opinion on the facts underlying its ruling. There is no articulated reason in this record why PLN's informative, non-salacious news reporting harms any security interests beyond defendants' assertions that they are sexually explicit, and therefore that they must be allowed to prohibit them. Well, what about, could I ask you to address, taking the article about the 10th Circuit, yes, I mean, that did contain, I mean, you didn't make it up. The article contained this because the 10th Circuit opinion contained a pretty explicit, you know, fairly graphic exchange between the inmate and the guard, in that case, who had a sexual relationship. And as I understood it, one of the Arizona's concerns is, you know, inmates interacting with guards and using this material to sexually harass the guards. Why isn't, why isn't prohibiting the specific content in the 10th Circuit case rationally related to avoiding harassment of guards? Yes. So, Your Honor, the point of that article is to articulate the facts that were necessary to understand the ruling in that action. So, even under the exception that defendants added in 2017, it should be allowed because it is necessary to understand the rights of the whole purpose of the news article. And that language is also available in the law library that defendants allow people access to. So, there is no rational relationship between allowing that 10th Circuit quotation and banning the 9th Circuit quotation in the article that they allowed when they reviewed both of them side by side after receiving our demand letter. You'll see that the district court quotes the 9th Circuit language. It's quite explicit as well. Nonetheless, that was allowed and the 10th Circuit ruling was not. So, the point is that there's so much employees in the mail room. There are dozens of them. They span all of the institutions. And the only training they receive is that there are bright line rules where they have to ban anything that mentions sex in any of its forms. That is a bright line rule that they were trained to receive. And that they are supposed to use common sense and good judgment when deciding whether something may cause arousal or maybe sexually suggestive. This is the exact opposite of the type of restrictions and safeguards that the Thornburg Court approved of. Defense counsel tries to pretend that these are the same policies that are at issues between Thornburg and this case, but they are simply not. They are very obviously distinguishable. The Thornburg provisions were limited to homosexual, bestiality, sadomasochistic, and involving children sexual text. It explicitly allowed heterosexual explicit text. So, that is in footnote 6 of the Thornburg opinion and it's very clear and it's been articulated by this court in its recitation of what the scope of the ban in Thornburg was as well. Additionally, there's a broad exception for explicit materials involving news or information or with literary, social, or scholarly value in Thornburg. That doesn't exist here. And most importantly, the discretion that was allowed under this relatively broad policy is tabbed very carefully by requiring wardens themselves to look at the individual circumstances of a particular prison at a There's a non-delegable duty that the warden has to look at every single piece of information and decide if it's actually dangerous. That simply doesn't exist here. Not only is the cleaning and censorship done by mailroom employees, it's only reviewed by anybody higher if there's an appeal. Unlike, it's the opposite in Thornburg. Anytime a mailroom employee who screens thought something should be censored, it would go to the warden for the final decision. So it's the inverse of the situation we have here, which is a strong, limiting safeguard that doesn't exist in the Department of Corrections of Arizona. So the policies are very different. And additionally, the construction that defense counsel wants you to believe exists in this case is simply not reasonable. It's not a constitutional construction if the reading of the text that they want you to ascribe to is not plausible. And it's simply not plausible. If you look at the language of this provision, so first, let me say, first of all, that even if you accept the provision and the construction defendants offer, it does nothing to curb the breadth of Section 1.2.17, which is not about material at all on its face. So nothing that defense counsel has said can cure the overbreadth of that. So second of all, if you look at Section 1.1, it clearly says there's an or here, okay? So it says both sex-related provisions and dangerous things have to be prohibited, right? But there's an or. And the structure of the rest that follows, which are subsections, includes both sexual things and non-sexual things. And if you assume that they really meant and instead of or in that provision, then it creates a surplusage of sexually explicit in that sentence because you don't need to say the word sexually explicit if only sexually explicit things that are dangerous are prohibited. So furthermore, none of the evidence and none of the ways that defendants have articulated their policy in the district court or in this court, really, lend credence to the fact that this is actually a narrowing construction that they employ. First of all, all of the examples that you have of, you know, Great Works, pictures in the Vatican, the Mayo Clinic, former President George W. Bush's self-portraits that contain zero nudity, all of those things are prohibited and defense counsel makes no attempt to disclaim any of them here. So moreover, the training that people received on this policy, again, bright line rules prohibiting nudity, prohibiting sex, prohibiting oral sex, prohibiting masturbation. That is literally a bright line rule conveyed as training to the people that are implementing this. That means the policy is what it says. It is literally as broad as you think it is and as it reads because that's what they're training people to do. And finally, I will note that the staff administering the policy clearly didn't understand there to be a separate dangerous requirement, which was only raised on reconsideration, by the way, never raised in any of the briefing previously, because if you look at the record, at ER 234-1 at page 26, the head of the Office of Publication Review describes the policy that she's administering and she describes the relevant portion of the order 914.07-1 as prohibiting, quote, sending or possessing of any explicit material. And the sentence ends there. She doesn't even discuss there being any other requirement. She doesn't even quote the rest of that provision because it's not the provision she was trained to apply and it's not consistent with a literal reading of this policy. And I think, you know, frankly, if you look at any of these examples, there are dozens and dozens in the record of the ways in which these very innocuous photographs of clothed women sitting with a chair turned backwards in non-sexual poses, of great works of literature by Maya Angelou and Murakami being censored, all of these make clear that this is the scope of the policy. This narrowing construction that's never been written down anywhere that no one got trained on is not real. And I'd also just like to point out, Defense Counsel has tried to analogize this case to various other cases and saying this is the same thing. It's very clear it's not. Barampour covered pictures only, not text. This covers both. It contained an exception for nudity that wasn't involving sexual acts or behavior. Again, this covers any nudity, whether there's sex involved or not. And it contained exceptions for content with scholarly value or social or literary value and news or information as well. And similarly, obviously, Morrow only contains pictures. And that is something that really was important to the court in Morrow. The Morrow court cared that people could access the sexually explicit material. And again, that's not even including sexually suggestive material, which is also an issue here. Sexually explicit material, they cared that prisoners could read that, that they could read about Malcolm X, that they could read about, you know, great works of literature like Lady Chatterley's Lover, all of which contained things that are prohibited under this stretch. And, you know, I guess the last thing I'd say is that just that it, while Defense Council emphasizes the fact that all of the examples of substantial overbreath that are real and that are in the record and that you can see don't matter, the point is, is that those are not necessary to the ruling, but they illustrate the ruling. The policy text itself says everything it needs to for you to understand the scope of what it is. And that is how people were trained. So although these examples are in the record and they are illustrative, and we think that they are entirely relevant, they are not necessary to the overbreath ruling. So even if you agree with that argument, it doesn't matter because the literal text of the policy is as broad as it literally reads. If 1.2.17 were excised from the policy, it seems like most of the examples in the record of the innocuous material that was, or the innocuous pictures that were restricted, I assume were under that, or it seems like had to be under that provision. But maybe you disagree. So can you address, you know, how far would that go to solving the problem in your view? I do disagree because many of the materials, for example, the news articles about rape, about sexual assault in doctor's offices, those are literally about rape and about sexual assault. They're reported in a newsworthy way. They are not reported in any way that's salacious or intended to cause excitement, and they're not sexually suggestive. They are literal depictions of the of people's experiences. And similarly, you know, pictures in the Caravaggio of naked people, that is banned under the literal text of 1.1 and 1.2. Statutory nudity is banned as a bright line matter. So it wouldn't cure the overbreath. And similarly, you know, all of these protections that Thornberry found mattered don't exist in this policy, and that allows for unfettered discretion. And moreover, I lost my final point, but I think unless the panel has further questions for me, I'll rest. Thank you. Thank you, counsel. We'll hear from Bob. Thank you, your honor. The counsel keeps talking about that these are educational materials. This is not scrutiny given or less strict rules because of the type of material it is. And that's one of the problems here. Just because an article is in a particular magazine doesn't make it more or less sexually explicit and doesn't defeat or solve the problem just because it's in a nice publication as opposed to a not nice publication. Thornberry's exactly on point. Thornberry, there's that strange footnote that's hard to understand. And it looks like it's only limited to homosexual activity, but it's limited to all homosexual activity. So whether it's all homosexual explicit activity or heterosexual and homosexual activity, it doesn't matter. The Thornberry court approved a regulation allowing regulation of all explicit material. This court in Barampour, it does cover text. It's set out in the brief. Approved a regulation broader than the department's. There was no linkage to it being detrimental to security. Approved the regulation saying all sexually explicit material is prohibited. More than here. PLN's talking about how these other protections were there in Thornberry. The same protections are here. And again, this court in Morrow rejected that as being an important part of the analysis because they approved low-level people in Morrow making these decisions. Can you address the point that your friend made about the policy in Thornberry had an exception for scholarly or literary value, and you don't have such an exception. We do have an exception for that. I know it talks about literary, but the Thornberry court said in a footnote, I think it's footnote nine, that it's okay that there's no exception for literary and scholarly value. And they made an example of, oh, a drawing of something or a medical picture is just as bad and can be seen as just as causing just as many problems if it's in a great work of art or not. Thornberry specifically addressed that and says it's okay. The department also has, and I'm sorry, I don't have the actual numbers of the regulations. There is an exception, I know, for great works of, I think it's great works of literature and religious texts. There's definitely an exception for legal matters if you can show that the legal matters are important to the decision there. But Judge Miller, as you brought out, just because it's in a Tenth Circuit decision doesn't make it less sexually explicit. Obviously, prisons are different than the outside world. We don't have to show the reasons why we did this. The reason is in Morrow, and we had evidence of the reasons anyway, that there was problems in the prison before we turned around and we put in these restrictions and the problems are better now. That's enough to meet the first requirement under Turner. And that's where the court stopped here. Looking at all this extraneous information is not part of the Turner test. This court said, you look at Turner to make an overbreath analysis. And this court went far outside of that, looking to a few handfuls of things, looking to interpreting language that doesn't need to be interpreted the way it did. It took a constitutional interpretation when there's a perfectly plausible constitutional interpretation of this language. And it makes sense to say sexually explicit material that's detrimental to the prison is excluded and content that's detrimental to the prison is excluded. These cases are exactly the same as those in Thornburg and in Barampour. You're about a minute over your time, so thank you very much. Thank you, Your Honor. I appreciate it. Thank you both for your arguments today. The case just argued will be submitted for decision and will be in recess until morning. Thank you. Judges and council members, this court for this session stands adjourned.
judges: Hawkins, Thomas, Miller